Okay, the last case of this morning is 18-60604, Jalloh v. Barr. We'll hear from Mr. Wilcox. Mr. Wilcox, just to make a long story short, we're certainly aware of the facts in this case and that your client had advocated in public in the op-ed pieces against female genital mutilation and was threatened two times and then fled the country to the U.S. And is seeking asylum, and the only question is whether the board, what was it, properly considered, is remand warranted because he has established a well-founded fear of future persecution? Well, thank you, Judge Jones, and may it please the Court, Jason Wilcox on behalf of Mikailu Jalloh. I think the issue might be a little bit different than that. I think the United States and Mr. Jalloh agree that a remand is required on the future persecution question. I think the issues that are presented here are, number one, whether the board erred by holding that the death threats that Mr. Jalloh received, in addition to the home invasion and the attempted attack by the Bondo carrying sticks and rocks, qualifies as past persecution under the INA, and number two, whether the article that he wrote criticizing Sierra Leone for not outlawing female genital mutilation expressed a political opinion. The BIA and the IJ both concluded that he did not. The IJ actually saying at ROA 106 that he was purely expressing an opinion on a cultural issue, which I think is hard to square with the article itself. Are we reviewing the IJ or did the BIA incorporate the IJ? The BIA incorporated the IJ. It said it was adopting the IJ's conclusions and relied on the IJ's findings. Tell us a little bit about the Bondo. The Bondo are what's known as a secret society in Sierra Leone. Are they Islamist? Are they animist? I'm honestly not sure the answer to that question, although my belief is that they are. I'm confident they are not Islamist, Your Honor. They may be animist. I don't know exactly. The reason I know they are not Islamist is because an Islamic preacher spoke out against female genital mutilation, and the record shows that he was burned alive, which is one of the reasons why. He might have been a Shia rather than a Salafist. That's fair, Your Honor. I guess that's true. I don't know whether the Bondo are Islamist or animist or exactly what variant of Islam they may subscribe to. What I do know is that in Sierra Leone they exercise enormous political influence and command a number of voters. You can see that in ROA 517. That's your position anyway. Let me ask you why. I'm inclined to just cut to the chase and remand, but for my own sake, I don't know about my colleagues. The fellow gets attacked by a herd of women. Can we really consider that past persecution, even if they are threatening to kill him? I think that even if it was just, as you said, a herd of women, that could count as past persecution, but it was a group of both women and men, and you can see that in ROA 244 to 249. When that group came, they came carrying sticks and rocks. They broke into the house looking for him. When they didn't find him, they told his sister-in-law, you're a dead man walking. Wasn't that the second time? That is the second time that they came. That was the first time. The first time they came, when they learned that he was planning... That was five women. I agree, Judge Jones. The first time it was a group of five women that came to his house, and they told him, if you continue advocating again, we hear you're going to write this article against female genital mutilation. If you go forward and do it, and if you do not stop, we will kill you. You can see that in ROA 234 and 236. Mr. Giallo then makes the decision that he's going to go ahead and write the article anyway, and I don't think that he should be punished for that act of bravery in doing that, and then he decides to write the article, and a month later, the Bondos show up at his house, and they show up with sticks and rocks, and they call him a dead man walking when he is not there, thankfully, so that they can't actually carry out the attack that they were clearly aiming to do by breaking into the home and threatening to burn it down. Now, your brief, as I recall, relies mostly on cases from outside the Fifth Circuit to say this is past persecution. So what are your best Fifth Circuit cases to suggest that these two events alone constitute past persecution? Well, I think that the best case that we have is the Tamara Gomez case, which is 447 F. 3rd 343, and in that case, it was an individual where him and his family member were repeatedly threatened by FARC rebels in Colombia. There was never any physical violence against him or his family, and this court held that that presented not just a case of past persecution but a compelling case of past persecution and actually overruled a BIA decision finding that that did not amount to past persecution. So I think that makes this court perfectly in line with the decisions from the First, Second, Third, Seventh, and Ninth Circuits that have all held death threats alone can amount to persecution. And I think it's also important here that we have more than death threats. This is not just a threat that is made to him. They came willing to carry out the threat, armed with sticks and clubs, broke into the house, and threatened to burn it down. I think that takes it beyond just mere words. You know, as this court said in Hernandez v. Arguello, when there's threats plus evidence of intent to carry it out, that can be enough to establish past persecution. And the Seventh Circuit has said the same thing in the Benchco case, which is 468 F. 3rd 486, and we cite that number. But we'd have to say, you know, that this is not substantial evidence to support the BIA's conclusion. So I think you could say that. I think the record would support that here, but I don't think you have to say that, Your Honor, because as this court held in the Morales v. Sessions case, whether the undisputed facts amount to past persecution is a question of law that this court reviews de novo. That doesn't make sense to me, but maybe that's the law. It sounds like a question of fact to me, but... Well, let me explain for two reasons why I think it is a question of law. I think the primary reason is because the definition of refugee, which includes persecution in the INA, was added by Congress to bring the United States into line with international conventions on the status of refugees, and that's the Supreme Court's Cardoza-Fonesca case that discusses that. And so if the question is, are we in line with this international regime that we're trying to adhere to, that's a legal question, not a factual one. And I think that's why not just Morales v. Sessions, but also the Second, Third, Sixth, Eighth, and Ninth Circuits have all considered this question and have concluded that past persecution and whether the undisputed facts amount to past persecution is a question of law. But even if you disagree with that, Judge Jones, which I understand you might, I think the evidence here is compelling and would require a finding as a matter of law that Mr. Giallo suffered past persecution at the hands of the Bondo. I think that this is exactly the same compelling case of past persecution as in Tamara Gomez. The only other question I have, because really we're becoming very familiar with asylum requests now, unless my colleagues disagree, the government suggests we don't even need to decide whether he experienced past persecution because they're willing to remand simply to consider whether he has a well-founded fear of future persecution based on political opinion. Why is that not enough to resolve the case? Well, I think for a couple reasons, but primarily because this Court has made clear in cases like Cabrera v. Sessions that the immigration judge and then ultimately this Court have to consider both past persecution and future persecution and that they are both routes to an asylum conclusion. And in particular, it can matter for the burden of proof because if he suffered past persecution, then that establishes a presumption and then that means that it's on the government to prove that country conditions have not changed and that he could not relocate to a different part of the country. If all that Mr. Giallo was able to establish was future persecution, then the burden would be on him. Now, I think that no matter where the burden falls, given the government's put in no evidence about changed country conditions and no evidence about his ability to relocate, he would win regardless of where the burden falls. But that burden-shifting question is important and is an important reason why this Court needs to address the past persecution issue. And I think it also needs to address the political opinion issue, which is squarely teed up in front of this Court. The government doesn't dispute that he expressed a political opinion. As a matter of fact, if you look at pages 24 and 25 of the government's brief... Then you don't need to argue it. Well, except for the government is asking for a remand for the board to reconsider it, and I don't think that makes sense when no one is actually disputing that he expressed a political opinion. I think that this Court should decide the issue. There's no reason to send it back when the BIA and the IJ both considered the question and just got it wrong. That's exactly why we should have this Court clear up the issue. And then, of course, there's also the issue of whether the government can control the bondo, and we don't think that requires a remand either, although I know the government disagrees about that, because we think that the evidence here is clear and undisputed that the government of Sierra Leone cannot control the bondo. You know, there's this preacher that we've discussed. There are the journalists who are frog march through the streets naked. There are the police releasing bondo members after initially detaining them because of threats from the bondo, and there's zero evidence in the record of the government of Sierra Leone ever taking any actions against them. Well, if anarchy is the basis for refugee status, then 90% of the countries in the world populations could come to the U.S. unfettered, and we hear this all the time from Honduras, as you know, and from Guatemala. The police won't step in. The police are just scared of the narco-terrorists and so on. Well, I think it's more than anarchy, Judge Jones. It is that the bondo actually holds significant political power in sway, and that's not just my opinion. There's a UNICEF report at ROA 517. It's also documented in reports from other government agencies and in human rights journals at ROA 488, 501, 563, and 569. You know, in the words of UNICEF, the bondo exercise enormous influence and command political support. There's a human rights journal from the Harvard Human Rights Review that's in the record. That's at, I believe, at ROA 488 that discusses how the bondo and their support and supporting the bondo is a vote-getter in Sierra Leone. So this is not just anarchy that the police won't do anything. This is the bondo have co-opted the arms of the government and the political process to support themselves and to stop anyone who opposes female genital mutilation. Okay. All right. If there are no further questions, I'll move the balance of my time. Thank you. Nope. Okay. Good morning, Your Honors. May it please the court, my name is Greg Kelsch. I represent Attorney General William Barr. I'd like to begin with an update for the court. Since the briefing was concluded, I'm advised by DHS that Mr. Gillow was released from DHS custody on May 3, 2019, which is subsequent to the filing of a petition for habeas corpus. So I just wanted to bring that update. What I would like to do today is start with the areas of the case that we believe need to be remanded, and then I will address the past persecution issue. So in order for an applicant to be eligible for asylum and withholding or removal, they have to show persecution by the government or a force the government is unable or unwilling to control and on account of a protected grounds. So the first issue here is Mr. Gillow's claim was that he faces persecution by the Bondo Society, and he argues that that is a group that the government of Sierra Leone is unable or unwilling to control. And the problem with this case is that the BIA held that Mr. Gillow failed to demonstrate that the government of Sierra Leone would punish him for his journalism. They didn't address the claim that he's raising, which is it's the Bondo Society that he fears, and will the government of Sierra Leone, are they able and willing to protect him from the Bondo Society? That's an issue of fact that my client agency needs to address in the first instance. It is not my role here today to adjudicate his claim to say that he will, that he should or should not get asylum or withholding of removal. He may well be granted asylum or withholding of removal on remand, but at this point the agency has not addressed the issue, is the Bondo Society a group that the government is unable or unwilling to control? And I do want to point out that although there's a lot of evidence in this record that the Bondo Society runs amok, I do want to just note for the court that as Mr. Gillow brings the court's attention to an article, news article, it's a record of appeal, pages 561 to 563. This is about a young woman who's subjected to FGM. She's being held in a home after the procedure is done, and the article says that the police, they took action. They went into the house. They've extracted her from the home. They did arrest the Bondo Society member who did this. Mr. Gillow emphasizes, of course, that the police precinct was surrounded by Bondo Society members. The police felt that they needed to release this person that they had detained, but the fact that the police took some action, that does support the contention that perhaps this question could go either way. Also, I will note, and this is on page 251 of the record of appeal, Mr. Gillow did not seek police protection, and that is often relevant in cases of unable or unwilling to control. So for that issue alone, the case needs to go back to the agency. Also, there is the issue of whether he was targeted on account of his political opinion. The BIA's decision is unclear here, but we don't think the BIA is saying that political activism that involves culture is no longer political activism. I've never seen the BIA do that in any of its published or unpublished decisions. I think one of two... I never took that position in regard to the one-child policy. That is correct, Judge Jones. I think one of two things has happened here. Either the BIA is holding that the political dimensions of his article was not one central reason for why the Bondo Society targeted him, or they just didn't focus on the fact that his article had a very real political dimension. I don't know. That is our honest answer here. The case has to go back anyways for the unable or unwilling to control issue. The court should also direct the BIA to explain and to clarify... Is the Bondo Society targeting him on account of the political nature of the article? And again, it's not my place to adjudicate his claim here, but I do want to point out to the court that when the Bondo Society first threatened him, that happened before he published his article. They went to his home in November of 2016, and according to his testimony, they said to him, you're the one responsible for Umu, that was his girlfriend, not accepting our culture, and you should stop. If you don't stop, we will kill you. So they didn't say anything to him in November that was of a political nature. Maybe they weren't targeting him on account of his political opinions. On the other hand, as I'm sure Mr. Gillot's counsel is going to note, they came back the following month after he published his article, and there were more people, they had sticks and rocks. We just don't know. This is an issue for the agency to resolve in the first... Did his girlfriend come with him? No, Your Honour. He said that he has not had any contact with her since he left Sierra Leone. And so finally, that brings us to the issue of past persecution. And as Judge Jones noted, the case has to be remanded anyways to the BIA, the court need not actually reach this issue. It's entirely possible he might be granted asylum or withholding of removal just based upon a well-founded fear of future persecution. But to the extent the court wishes to reach it, we maintain that the BIA correctly held that what he experienced did not rise to the level of past persecution. So on this topic, I want to begin by noting that the past persecution issue, it's analytically distinct from the well-founded fear of future persecution issue. When we're looking at a well-founded fear, we take all of the evidence of record, including the threats that were made against him, and we try to predict, is there a well-founded fear that he may be persecuted in the future? Yeah, but he's... As Mr. Wilcox says, it does affect the burden of proof, does it not? It does, Your Honour. So for him to establish past persecution, he needs to prove three things. First, that he experienced extreme harm, that it was on account of a protected ground, and by the government or a group the government is unable or willing to control. So those last two elements are still in play. What we're only talking about here is, is what he experienced, is that, in and of itself, sufficiently severe enough to be characterized as persecution? And the BIA correctly held that it was not. He was threatened on two occasions. The first was in November 2016, before his article was published. Five women came to the House. As I just said to you, they told him, you're responsible for Umu not accepting the... You know all the facts. Yes. How does this stack up against relevant Fifth Circuit law on past persecution? Yes, the closest case to this, the case that Mr. Gillot was relying on is Tamara Gomez. The harm at issue here is... The threats at issue here were far less severe than Tamara Gomez. Here, he was threatened in November 2016. He told them, I don't believe in that practice. I'm going to investigate and expose what you are doing. And he closed the door. He went back into his house and he paid them no more attention. In fact, he even continued on with his investigations and his journalism. It did not change his behavior and how he lived at all. It was not until December 2016, an event where he did not personally experience, he was not at the home, that's when people came back, several people, armed with rocks and sticks, they came looking for him and said that if they were to find him, they were to kill him. Although that's unfortunate, for sure, and although that is relevant to his claim of a well-founded fear of future persecution, those two events, in and of themselves, are not... We have a whole bunch of cases where we have denied asylum relief where people in Central American countries were threatened repeatedly by gangs. That is correct. That's what I was trying to get you to talk about. Yes, Your Honor. Usually what the court looks for is some instance where there's some physical harm. You know, some beating. And pardon me, it's a grisly business, but this is what we have here. We look for some sort of a beating, a roughing up of the person in addition to the threats. In Tamara Gomez, that man was threatened over the course of a year by the FARC, and it wasn't just the threats. He had to leave his home. He and his family moved to another home, and then the FARC found him in another home, and then he had to send his family to the United States, and then he had to go live on a military base for protection, separated from his wife and children because there wasn't any housing for her. So it's not the applicant's decision to leave the country that is the persecution. It's the events that caused the person to leave. And here, although it, Mr. Jullo experienced, was unfortunate. We accept that. These two incidents, being threatened in November 2016 and December 2016, those two incidents in and of themselves did not rise to the level of persecution. So... unless there are further questions, I will conclude by saying again we believe this case should be remanded to the BIA for the agency to determine in the first instance is the Bondo Society a group that the government is unable or willing to control? Are they targeting him on account of his political opinions? And to the extent the court reaches the past persecution issue, we maintain that, although unfortunate, this does not rise to the level of past persecution. Thank you. A couple of brief points, Your Honor. Starting on the past persecution, and the government's claim that this is far less severe than what happened in Tamara Gomez. In both cases, the person was threatened with death. And in both cases, there was no physical harm inflicted. I know what the FARC is. The FARC ruled substantial portions of Colombia for a long, long time. And they were a revolutionary and a military powerhouse there. And we don't know, although you have submitted evidence, that the Bondo has... has the same status in Sierra Leone. Well, I think that all of the evidence that has been submitted in this case shows that the Bondo does have the same status in Sierra Leone. How do you distinguish the numerous, and admittedly many of these are unpublished, Fifth Circuit cases where we have women who are constantly threatened in Honduras and Guatemala and El Salvador by gang members, but unless they actually commit robbery, rape, murder, or whatever, violent assault, we mostly do not say that that is past persecution. Well, I think two responses, Judge Jones. Number one, this court in Edouard specifically held that physical violence is not required. It may be. And, you know, that's a decision of this court. And I think that the other thing, though, is what sets this case apart is that the Bondo came to his house twice. It was an armed mob that came to his house. And the Bondo belonged to a group that is undisputed, have a record of violence for going against opponents of female genital mutilation. And the FARC were definitely an atrocious group that did a lot of horrible things, but there were a lot of people they threatened who weren't harmed. In this case, there's no evidence of anyone who has opposed female genital mutilation in Sierra Leone who hasn't been harmed by the Bondo. In fact, there's example after example of the Bondo harming opponents of female genital mutilation. That logically makes no sense, because, you know, if people aren't speaking up, then you don't know how many people oppose it, and they are not the overwhelming majority in Sierra Leone, or you'd be telling us the government was run by the Bondo. Well, I am telling you the government is run by the Bondo, and so is UNICEF. No, you're saying it's influenced by the Bondo. It's influenced. It's one of the most powerful political actors in Sierra Leone. It is not logically accurate for you to suggest that every person who opposes FGM has been persecuted, because you have no proof of that. That's fair, Your Honor. I don't have to go that far. All I have to go to is... Okay, well, all I have to go to is everyone who has spoken out against female genital mutilation that we have evidence of in the record has been harmed by the Bondo, and that's not just one or two examples. We've offered five or six different examples between the preacher who was burned alive, the 28-year-old woman who was bound and gagged by the Bondo that the government mentioned, and many others. Yeah, and then you have the contrary evidence, and I'm not saying how it would come out. I agree with the government on this score, but you do have the contrary evidence where they rescued the young woman who had been detained. Well, so there's no evidence that they actually rescued the woman. What it is is the woman, after her violence, she got away from the Bondo. She went to the police and complained. The police went. They did initially arrest the woman who cut her and mutilated her, but then as soon as the Bondo complained and surrounded the police station, they let them go, with the officer saying, it would have gone badly for us if we hadn't released her. That's showing that the government cannot resist the Bondo. Now, I want to make one quick point about political opinion, too. I see him in my last ten seconds. The government said, we don't know whether Mr. Giallo was being persecuted because of his article or not. Well, the BIA... Sorry, the immigration judge said he was at ROA 101. And we know at ROA 248 that what the Bondo said, and this will be my final point, Judge Jones, what the testimony is, is that they came to the House on that second occasion and, quote, they said, first, they come and warn me I should stop, and I wrote an article like I'm directly attacking them. So the reason for coming the second time and for seeking to persecute him was because of writing the article. That's at ROA 248. And if there are no further questions, thank you, Your Honors. All right. Thank you. It says until... Oops. Darn it. Oh, dear. I've got to grab something that fell under the desk, so just ignore me, and you're dismissed till 9 a.m. tomorrow.